*Notice:* This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NURIA MENGISTEAB, | ) | |
| | ) | Supreme Court No. 15986 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-08093 CI |
| v. | ) | |
| | ) | O P I N I O N |
| AHLA-TAKI OATES, | ) | |
| | ) | No. 7267 – August 3, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Nuria Mengisteab, pro se, Anchorage, Appellant.[*]

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

## I.     INTRODUCTION

Nuria Mengisteab filed a motion to modify custody to relocate with the parties' young son to another state, and then moved two days later. After several months the superior court ordered that the child return to Alaska and conditionally awarded

---

[*]     The appellee, Ahla-Taki Oates, filed a pro se motion for reconsideration of our decision to accept Mengisteab's late-filed notice of appeal. Oates did not file a brief on the merits of the case or otherwise participate in this appeal.

primary custody to the father if Mengisteab chose to remain out-of-state. Appealing pro se, Mengisteab argues that the superior court erred in several respects. We conclude that none of her arguments have merit, except for her contention that the court failed to consider the effect separation from his mother would have on continuity and stability in the child's life. Because the court was required to consider the child's best interests based on the assumption that Mengisteab would remain out-of-state, we reverse and remand for further proceedings.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Saul was born in Alaska in March 2013 to Nuria Mengisteab and Ahla-Taki Oates.[1] Mengisteab and Oates never married, nor have they lived together. Mengisteab also has two older sons and an adult daughter from two other relationships. Oates is married to another woman and is raising three other children.

### B.     Proceedings

In July 2013 Oates filed a complaint requesting sole legal and primary physical custody of Saul with visitation by Mengisteab to be determined by the court. Mengisteab responded by requesting shared legal custody and primary physical custody. She also requested that Oates's visitation be limited to two days a week for two hours a day because Saul was breast-feeding. The parties participated in mediation and entered into an interim custody and child support agreement in September, giving Mengisteab primary physical custody, giving Oates visitation, and obligating Oates to pay $500 per month in child support for October and November. At a hearing in November to determine whether the parties could resolve any of their issues without trial, the court was informed that Mengisteab planned to move to Las Vegas in February 2014.

---

[1]      We use a pseudonym for the child's name to protect his privacy.

In February 2014 the superior court held a half-day custody trial. Mengisteab testified that while she earlier had planned on moving out of state, she was not going to do so at that time, but she requested primary physical custody of Saul because it was in his best interests. She also alleged that Oates had a drinking problem and that his wife abused heroin. Oates testified that he sometimes had a few drinks at home with his family but "never did drugs" and "never had any abuse problems." Oates's wife testified that she had used illegal substances in the past but denied an abuse problem. Oates and Mengisteab's sister both testified that on several occasions when Oates had scheduled visitation, Mengisteab refused to let him see Saul. Testimony by both Mengisteab and her sister also indicated that Mengisteab was resistant to using a breast pump so that Saul could remain on his feeding schedule while Oates exercised his visitation; this made it difficult for Oates to exercise any prolonged visitation with Saul.

After the conclusion of the hearing, the court made written findings on all the statutory best interest factors.[2] The court found that (1) Saul had no special needs; (2) both parents were capable and desirous of meeting Saul's needs; (3) Saul's preference was not applicable;[3] (4) love and affection existed between Saul and each parent; (5) the length of time Saul had lived in a stable, satisfactory environment and the desirability of maintaining continuity at the time favored Mengisteab as Saul had primarily resided with Mengisteab in a stable, satisfactory environment; (6) Mengisteab was clearly reluctant to facilitate an open relationship between Oates and Saul except on her restrictive terms; (7) there was no substantiated evidence of domestic violence, child abuse, or child neglect; (8) there was no substantiated evidence of substance abuse; and

_____

[2]    AS 25.24.150(c) requires the court to consider the best interests of a child based on a set of factors when making custody decisions.

[3]    The child's preference is only a relevant factor "if the child is of sufficient age and capacity to form a preference." AS 25.24.150(c)(3).

(9) Mengisteab's testimony was less persuasive because of her agenda to limit Oates's time with Saul, but she was a good provider and had met Saul's needs. Based on these findings, the court awarded primary physical custody to Mengisteab and established a visitation schedule for Oates.

At the end of May 2014 Mengisteab filed a motion to modify custody. She informed the court that she would be moving out of state, that "[t]he current custody agre[e]ment will no longer work," and she repeated her concern that "there[was] substance and alcohol use in [Oates's] home." She also requested back child support from May 2013 to September 2013, indicating that during the "Feb[ruary] 2014 court hearing, child support in arrears was not addressed." Shortly after filing her motion, Mengisteab left Alaska with Saul without informing the court or Oates where she would be residing. She later testified that the initial plan was to move with her boyfriend to Las Vegas, where her boyfriend's parents as well as her ailing grandfather lived, but she and her boyfriend had split up and she ended up staying in Las Vegas for only two days. She then moved to Olympia, Washington where she had previously lived for ten years, where she had given birth to two of her children, and where she had extended family. She also indicated she had secured a job and begun taking classes to renew a medical assistant license she had obtained in Washington in 2002.

Due to several scheduling and communication conflicts, the court was unable to hold a custody modification hearing until early October 2014, which continued in late November. During the October portion of the hearing, the parties had a contentious discussion about visitation and back child support.

After the November portion of the hearing, the court issued an oral ruling allowing Oates to travel to Washington to visit Saul at least three times before June 2015 and authorizing half of the travel expenses to be credited against any child support Oates owed. The court ordered that Saul was to return to Alaska by July 2015 and indicated

that if Mengisteab chose to return as well, the court would reevaluate visitation at that time. The court did not resolve the issue of back child support at the hearing.

The court thereafter issued a written order, memorializing the oral ruling and elaborating on its custody decision:

> Nothing has convinced the Court to change the findings in the decision concerning mother's unwillingness to let father be involved in [Saul's] life. The Court specifically finds that mother's move was motivated, in great part, by a desire to separate [Saul] from his father — or at least make it difficult to allow his involvement in [Saul's] parenting. Mother has no substantial ties to Washington. She lived and worked in Alaska for 5 years prior to her move.

> A substantial change in circumstances has occurred — mother unilaterally has moved out of state without notification. Father's visits have been effectively terminated or diminished by her move. The Court finds this is not in [Saul's] best interests. [Saul's] best interests would best be served by having both parents available to [him]. If left in mother's primary custody in Washington, the court believes that mother would continue to interfere with father's access and parenting of [Saul].

> The Court finds that it will be in [Saul's] best interest to return to Alaska by July 15, 2015. If mother moves back with [Saul], the 2/10/14 decision shall control visits. If mother doesn't move back, father will have primary physical custody and the parents shall submit proposed visitation plans to ensure mother's continued involvement in [Saul's] life.

Mengisteab appeals. She argues the superior court erred in (1) finding that Mengisteab's move out of state was primarily motivated by a desire to keep Saul's father away from Saul; (2) finding that there was no evidence of substance abuse in Oates's household; (3) failing to consider the potential consequences to Saul of separation from his mother were Mengisteab to remain out of state; (4) calculating child support;

(5) establishing visitation and addressing associated costs; and (6) demonstrating alleged bias against Mengisteab.

## III.    STANDARD OF REVIEW

Trial courts have "broad discretion in deciding child custody disputes"[4] and in determining whether a proposed child custody modification is in the best interests of the child.[5] We will overturn a court's best interests determination "only if the trial court abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[6] "A finding of fact is clearly erroneous only when a review of the entire record leaves us with a definite and firm conviction that the trial court has made a mistake."[7] When reviewing a custody decision, we will find an abuse of discretion "if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[8] We review de novo whether the trial court applied the correct legal standard.[9]

---

**4**      *Stephanie W. v. Maxwell V.*, 274 P.3d 1185, 1189 (Alaska 2012) (quoting *Melendrez v. Melendrez*, 143 P.3d 957, 959 (Alaska 2006)).

**5**      *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (citing *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

**6**      *Id.* (citing *Ebertz*, 113 P.3d at 646).

**7**      *Stephanie W.*, 274 P.3d at 1189 (quoting *Evans v. Evans*, 869 P.2d 478, 479 (Alaska 1994)).

**8**      *Id.* (quoting *Evans*, 869 P.2d at 479-80).

**9**      *Rego*, 259 P.3d at 452 (citing *McQuade v. McQuade*, 901 P.2d 421, 423 n.3 (Alaska 1995)).

We review visitation orders under an abuse of discretion standard.[10]  "A court abuses its discretion if it issues a decision that is 'arbitrary, capricious, manifestly unreasonable, or . . . stems from an improper motive.' "[11]  "We review de novo the question of whether a judge appears biased, which is assessed under an objective standard."[12]

## IV.  DISCUSSION

### A.    The Two Step *Moeller-Prokosch* Approach

We have established a two-step approach for determining the best interests of a child in a custody dispute where one parent plans to relocate out of state with the child.[13] The first step is to determine whether the planned move is "legitimate," which we have defined as "not primarily motivated by a desire to make visitation . . . more difficult."[14] The second step is to determine what is in the best interests of the child in

---

[10]    *Red Elk v. McBride*, 344 P.3d 818, 822 (Alaska 2015) (citing *Skinner v. Hagberg*, 183 P.3d 486, 489 (Alaska 2008)).

[11]    *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 204 P.3d 1023, 1026 (Alaska 2009) (alteration in original) (quoting *Dobrova v. State, Dep't of Revenue, Child Support Servs. Div.*, 171 P.3d 152, 156 (Alaska 2007)).

[12]    *Wells v. Barile*, 358 P.3d 583, 588 (Alaska 2015) (quoting *Sagers v. Sackinger*, 318 P.3d 860, 863 (Alaska 2014)).

[13]    *Moeller-Prokosch v. Prokosch (Moeller-Prokosch I)*, 27 P.3d 314, 316 (Alaska 2001); *see also Rego*, 259 P.3d at 453-55; *Eniero v. Brekke*, 192 P.3d 147, 150 (Alaska 2008) (citing *McQuade*, 901 P.2d at 423-24).

[14]    *Moeller-Prokosch I*, 27 P.3d at 316 (alteration in original) (quoting *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989)); *see also Eniero*, 192 P.3d at 150 (quoting *Moeller-Prokosch I*, 27 P.3d at 316).

light of all relevant statutory best interests factors and the reasons for the relocation.[15] If the move is legitimate, the court is not allowed to hold the move against a relocating parent, but if the move is primarily motivated by a desire to frustrate visitation, the court must take that motivation into account.[16] In conducting the best interests analysis in this context, the court must perform a "symmetric" analysis,[17] which means the court must assume that the move in question will take or has taken place and "make a determination as to whether it would be in the best interests of the parties' [child] to be in the physical custody of [one parent] or [the other]" in their respective locations.[18]

> **1. The superior court did not clearly err in finding that Mengisteab's move was primarily motivated by a desire to frustrate visitation.**

The superior court applied the first step in our two-step approach and found that Mengisteab's move was primarily motivated by a desire to deprive Oates of his ability to parent Saul.[19] Mengisteab argues that the court erred in making this finding. We disagree.

---

[15] *See Moeller-Prokosch v. Prokosch (Moeller-Prokosch II)*, 53 P.3d 152, 157 (Alaska 2002); *Moeller-Prokosch I*, 27 P.3d at 316.

[16] *Moeller-Prokosch II*, 53 P.3d at 157 (citing *Moeller-Prokosch I*, 27 P.3d at 316); *Rego*, 259 P.3d at 454 ("[W]e made it clear that the superior court may not hold a legitimate move against a relocating parent. The *Moeller-Prokosch* cases set the governing standard for custody decisions involving parental relocation. Once a parent has shown that the decision to relocate is a legitimate one, then that parent is not required to defend the move a second time by showing that life with that parent is superior to life with both parents in the same city." (footnotes omitted)).

[17] *Moeller-Prokosch v. Prokosch* (*Moeller-Prokosch III*), 99 P.3d 531, 535-36 (Alaska 2004).

[18] *Moeller-Prokosch II*, 53 P.3d at 153.

[19] *See Eniero*, 192 P.3d at 150 (citing *Moeller-Prokosch I*, 27 P.3d at 316).

While Mengisteab offered several legitimate reasons for her move, including social connections, family relationships, and schooling opportunities in Washington, the record provides clear support for the court's finding that Mengisteab's move was primarily motivated by an illegitimate purpose. Mengisteab repeatedly changed her plans about when she would leave Alaska, did not provide contact information or adequate notice of her move to the court, and did not provide either the court or Oates with a forwarding address. These actions led the court to find that Mengisteab was not credible and that she was motivated by a desire to interfere with Oates's ability to parent.

The court's ultimately unfavorable determination with regard to Mengisteab's move was made in the context of other instances evident from the record where Mengisteab resisted allowing Oates to visit with Saul, such as her repeated cancelling of scheduled visitations and her refusal to use a breast pump to accommodate Oates's visitations into Saul's feeding schedule. This context supports the court's ultimate finding with respect to Mengisteab's motivations.

Mengisteab argues that the court erred in finding that she had "[n]o substantial ties to Washington." Mengisteab testified that she previously lived in Washington for ten years, she still had all her friends from when she was 18, her children's aunts lived in Washington, she gave birth to two of her children there, and she had obtained a medical assistant license in Washington that she could renew after taking classes. Thus, she argues it was clear error for the court to find that she had no substantial ties to Washington. But even if this specific finding was clearly erroneous, in the larger context this error was harmless and does not undermine the abundant support the record offers for the court's ultimate finding that Mengisteab's *primary* purpose for moving was to undermine a relationship between Saul and Oates, especially considering Mengisteab had spent the five most recent years of her life living and

working in Anchorage. We conclude the superior court did not clearly err in finding that Mengisteab's move was primarily motivated by a desire to interfere with Oates's visitation and ability to parent.

More broadly, Mengisteab suggests that the superior court's finding impermissibly restricted where she could live with her children and her family. We have held that it would be error for a trial court to restrict where a parent can live.[20] A trial court does, however, have the authority to determine where *a child* will live by granting custody to a parent remaining in Alaska, so long as that determination is in the best interests of the child. In this case, the superior court clearly stated in the November 2014 custody modification hearing that it could not "order Ms. Mengisteab to be back. But [it could] order [Saul] to be back." This demonstrates that the court correctly applied this aspect of our case law, attempting to use its order to effectuate the best interests of Saul, not to control the location of Mengisteab. The superior court's finding that Mengisteab's move was primarily motivated by a desire to frustrate visitation and its resulting grant of custody to Oates may have restricted where Mengisteab could live *with Saul*, but it did not place any impermissible restrictions on her ability to relocate.

### 2. It was legal error not to conduct a symmetrical analysis of the potential effect on continuity and stability in Saul's life.

Mengisteab argues that "[r]emoving [Saul] from his mother and brother[]s would have been traumatic." She asserts that this is "not in the best interest of [Saul] and would have caused severe separation anxiety." In support, she claims that Saul had "fully lived with [her] since the day he was born" and "[a]t the time of the court decision [Saul] was not even 2 yet and hadn't had contact with his father in over 9 months." She adds that "[Saul] is well bonded" to his two brothers, that the court "awarded [her] full

---

[20]    *See Moeller-Prokosch I*, 27 P.3d at 317 ("We conclude that the trial court does not have the authority to place restrictions on a parent's ability to relocate . . . .").

physical custody," and that her "extended family love[s] [Saul] and cares for him." We agree with Mengisteab that the court erred in failing to adequately consider the effect living in Alaska without his mother and siblings would have on continuity and stability in Saul's life.

A symmetrical analysis does not require detailed parallel findings on every best interests factor.[21] In determining a child's best interests, "the superior court need not mention each factor by name; it is sufficient if the court's findings provide 'a clear indication of the factors [that the court] considered important in exercising its discretion or allows us to glean from the record what considerations were involved.' "[22] And the court may give enhanced attention to a factor it considers particularly relevant to a child's best interests, as long as it does not assign "disproportionate weight to particular factors while ignoring others."[23]

Despite this flexibility, in the *Moeller-Prokosch* line of cases we expressed particular concern that the court conduct a symmetrical analysis with regard to a child's relational and geographical stability.[24] In *Moeller-Prokosch III*, while we acknowledged that in its best interests analysis "[t]he superior court did recognize that [the child] would be devastated if he had to move to Florida away from [his father]," we concluded that the

---

[21]    *See Rego*, 259 P.3d at 455 ("While the superior court's analysis does not detail every aspect of [the child's] future in Alaska and in New Jersey, the court gives sufficiently detailed and 'symmetric consideration' to [the child's] experience if [the father] took him to New Jersey or relocated to New Jersey without him.").

[22]    *Caroline J. v. Theodore J.*, 354 P.3d 1085, 1092 (Alaska 2015) (alteration in original) (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013)).

[23]    *Stephanie W. v. Maxwell V.*, 274 P.3d 1185, 1189 (Alaska 2012) (quoting *Evans v. Evans*, 869 P.2d 478, 479-80 (Alaska 1994)).

[24]    *See Moeller-Prokosch III*, 99 P.3d 531, 535 (Alaska 2004).

court erred because it "did not discuss the corresponding effect on [the child] if he had to stay in Alaska after [his mother] moved to Florida."[25] In the parent relocation context, we also warned that a "continuity test centered entirely on the child's geographical stability would always favor placing the child with the non-moving parent," and instructed the court to also consider relational aspects of stability.[26] We explained that "the impact of separation is . . . properly considered as part of the stability analysis under the fifth statutory factor" provided in AS 25.24.150(c)(5),[27] which requires the trial court to consider "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." This stability analysis, we explained, "requires symmetric consideration of the consequences to [the child] both if [the moving parent] leaves with him and if [the moving parent] leaves without him.' "[28]

Consequently, the superior court here was required to evaluate and symmetrically analyze the best interest factors clearly affected by Mengisteab's move, especially the stability factor singled out in the *Moeller-Prokosch* line of cases.[29] The court's February 2014 order, which was incorporated by reference into its November

---

[25] *Id.* In *Moeller-Prokosch III*, we characterized the court's error as abuse of discretion. *Id.* However, as discussed further below, we also explained that AS 25.25.150(c)(5) "requires" and "commands" a comprehensive inquiry into stability and continuity, with no room for discretion to entirely forgo a symmetrical analysis. *Id.* at 534-35. Accordingly, while a custody award is subject to judicial discretion and reviewed for abuse thereof, it is legal error not to conduct the required comprehensive and symmetrical stability analysis.

[26] *Id.* at 535 (quoting *Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001)).

[27] *Id.* at 535 n.17.

[28] *Id.* at 536.

[29] *Id.* at 534-35.

2014 order, made specific findings about each of the statutorily required best interest factors. With respect to most of these factors, it was acceptable for the court in its November order to rely on its prior best interests findings because the record gives no clear indication that they changed in the eight months between February and November or in light of Mengisteab's illegitimate move.[30] We understand the trial court's omission of these factors as an indication that it considered them largely unchanged, a consideration we can "glean from the record."[31]

But Mengisteab's move clearly had potential to affect continuity and stability in Saul's life.[32] The superior court never explicitly discussed this factor or the effect that separating Saul from his mother were she to remain in Washington would have on him as required by our *Moeller-Prokosch* decisions. Saul had been in Mengisteab's primary physical custody from birth until the court's November 2014 order was issued. In February 2014 the court gave Mengisteab custody of Saul primarily because stability and continuity in Saul's life favored keeping him with Mengisteab. By November 2014 Oates and Saul were largely strangers, as the superior court acknowledged when it ordered Skype visits between Saul and Oates before their planned visitation, so that Saul would be familiar with Oates when Oates flew to Seattle and removed him from Mengisteab's physical custody.

---

[30] The record supports that in November 2014 Saul still had no special needs, the child's preference regarding custody remained inapplicable, both parent-child relationships remained loving, and there was no substantiated evidence of domestic violence, neglect, or substance abuse.

[31] *Caroline J. v. Theodore J.*, 354 P.3d 1085, 1092 (Alaska 2015) (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013)).

[32] *See* AS 25.24.150(c)(5).

The record does not indicate how the court's position on this factor changed since February 2014 or how the court weighed it relative to other factors in modifying custody. The only clues to the superior court's reasoning on this issue are its abbreviated November 2014 best interests analysis, its February 2014 best interests analysis, and testimony from various hearings. This information is insufficient for determining the court's position on this factor. As we have explained previously, the absence of any discussion of the impact on the child of separation from the out-of-state parent raises some question whether the best interests analysis was based on the assumption that the separation would take place, as we require.[33] To ignore this relational facet of stability[34] ignores both the primary concern that a symmetrical analysis is intended to address and an important component of the best interests analysis in this case.

We recognize that the court found that if Saul were "left in [his] mother's primary custody in Washington, . . . [Mengisteab] would continue to interfere with [Oates's] access and parenting of [Saul]." We have also previously explained that "[i]t is essential to have a custodial parent willing to foster an open relationship with the other parent when a great distance separates the child[] from the non-custodial parent."[35] Even so, the trial court may not rely on one factor to the exclusion of all others.[36] The trial

---

[33] *See Moeller-Prokosch III*, 99 P.3d 531, 535 (Alaska 2004).

[34] *See Barrett v. Alguire*, 35 P.3d 1, 9 (Alaska 2001) ("The trial court's consideration of the stability of the children's environment in a custody modification case can encompass a multitude of factors, including, but not limited to, the relationship with the custodial parent, the home provided by the custodial parent, the children's school, the community of friends and family, the cultural community, and the children's relationship with the non-custodial parent. It also includes stability of place.").

[35] *Silvan v. Alcina*, 105 P.3d 117, 121 (Alaska 2005).

[36] *See Stephanie W. v. Maxwell V.*, 274 P.3d 1185, 1189 (Alaska 2012) (citing

(continued...)

-14- 7267

court was required to consider the potential consequences to Saul both if he were to live in Washington with Mengisteab and if he were to live in Alaska without her,[37] and it was legal error not to do so.

We assume, but do not know, that Mengisteab now resides in Alaska. We also are aware that considerations of stability and continuity in Saul's life may well have changed since the last hearing. On remand, provided that Mengisteab still wishes to move, the superior court must conduct a symmetrical best interests analysis, including full consideration of the effect separating Saul from his mother would have on continuity and stability in his life were she to ultimately move to, or remain in, Washington. The court may take additional evidence as necessary to conduct this symmetrical analysis.

B.    **Mengisteab's Other Claims Of Error**

1.    **The superior court did not clearly err in finding there was no substantiated evidence of substance abuse in Oates's household.**

Mengisteab argues that the superior court erred with regard to "[s]afety concerns involving drug and alcohol use in [the] father[']s home." As part of its best interests analysis, the court should consider evidence of substance abuse.[38] However, "the scope of [this] inquiry is limited to facts directly affecting the child's well-being."[39] In its February 2014 order the court found that there was no evidence of substance abuse

---

[36]    (...continued)
*Evans v. Evans*, 869 P.2d 478, 479-80).

[37]    *Cf. Moeller-Prokosch III*, 99 P.3d at 535-36.

[38]    *See* AS 25.24.150(c)(8).

[39]    *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985); *see* AS 25.24.150(c)(8) (providing that the best interests analysis should consider "evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child"); AS 25.24.150(d) ("In awarding custody the court may consider only those facts that directly affect the well-being of the child.").

substantiated by a preponderance of the evidence, and this finding is supported by the record.  Oates testified that he "never had any abuse problems."  Oates's wife testified that she had used substances in the past but denied an abuse problem.  During the November 2014 hearing, the court pointed out that the only evidence supporting that there was substance abuse by Oates, his wife, or anyone else connected with Oates's household was Mengisteab's own allegations.  The court's factual findings, including its credibility findings — especially when the court makes those findings based on oral testimony — are due particular deference.[40]  Based on this record, we conclude that the court did not clearly err in finding there was no substantiated evidence of substance abuse in Oates's household.

### 2. The superior court did not abuse its discretion in calculating child support.

Mengisteab appears to argue that Oates failed to pay child support during 2013 and owes her $6,000 in back child support payments.  Mengisteab also claims that "Oates has been at the same job on the slope making over $130,000 a year [and] had the ability to financially support [their] son but refused to."  It appears that she is arguing that the court erred by failing to address Oates's failure to pay child support from the time of Saul's birth even though he had the ability to pay because of his job on the North Slope.

But the court did not abuse its discretion by not addressing the effective date of Oates's child support obligation or his potential responsibility for back child support at the February 2014 trial or the November 2014 custody hearing.  The issue of custody and visitation took priority during those hearings, and the court signaled that child support would be addressed separately.  The court followed through, addressing

---

[40]  *Stephanie F. v. George C.*, 270 P.3d 737, 745 (Alaska 2012) (citing *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008)).

child support in a separate order dated the same day as its November 2014 custody modification order.[41] The court's prioritization and timing of its decisions in this regard were not an abuse of discretion.[42]

### 3. The superior court did not err in establishing visitation and addressing associated costs.

Mengisteab claims that the superior court erred with regard to the "[v]isitation schedule and costs associated with them" but does not elaborate. Mengisteab's statement appears most relevant to the court's November 2014 oral findings and written order in which it determined that Oates "shall have reasonable phone and Skype/Facetime visits with [Saul]," and "shall elect 3 visits between now and next May[] when he can fly to Seattle and pick [Saul] up for a visit on his time off from the Slope." The court also ordered that Oates could credit half of the direct transit costs of the visits toward his child support obligation. In addition, the court found that if Mengisteab moved back to Alaska with Saul before the court's July 15, 2015 deadline,

---

[41] Mengisteab has not formally appealed the superior court's child support order. However, Mengisteab does list "Child support" in her statement of issues presented for review. Because the child support order was entered on the same day as the custody modification order — November 21, 2014 — it is possible that Mengisteab meant to include the child support order in her reference to the court's "final judgment entered on November 21, 2014" in her notice of appeal. That said, Mengisteab's brief does not discuss the issue of child support beyond repeated conclusory statements, and the child support order is not present in either Mengisteab's excerpt of record or the record as a whole. On appeal, "issues not briefed or only cursorily briefed are considered waived." *Daggett v. Feeney*, 397 P.3d 297, 304 n.19 (Alaska 2017) (citing *Shearer v. Mundt*, 36 P.3d 1196, 1199 (Alaska 2001)). To the extent Mengisteab meant to challenge the separate child support order, her challenge is waived.

[42] *See, e.g.*, *Kailukiak v. State*, 959 P.2d 771, 775 (Alaska App. 1998) ("Trial judges should, of course, be as free as possible to fashion procedures that expedite the business of their courts and that satisfy the litigation needs of the parties appearing before them.").

then the February 2014 order, which accounted for daycare arrangements and Mengisteab's work schedule, would control visitation. The February 2014 order outlined a visitation schedule that would accommodate Oates's schedule as a slope worker and Mengisteab's work and daycare considerations. In the November 2014 order, the court also tailored visitation to Mengisteab's potential geographical location and took into account the extra cost to Oates of visiting Saul in Washington. The court's decision was not an abuse of discretion.

### 4.     The superior court's conduct did not demonstrate judicial bias.

Mengisteab finally argues that the superior court was biased and prejudiced against her, and that the judge had a conflict of interest. She raises this argument for the first time on appeal, which would typically be grounds to consider the argument waived.[43] However, in *Greenway v. Heathcott*, we explained that it is unclear "what must be done to preserve for review a claim of judicial bias, if, as here, there has been no motion for recusal, disqualification, or new trial" — that is, where there was no opportunity for the trial court to address the issue.[44] In that case, although we ultimately found the claims of bias unwarranted, we assumed, without deciding, that the bias issues raised were properly preserved for review.[45] We make the same assumption here.

"A judge must recuse himself or herself if there is bias. If the appearance of bias is involved, we have held that the judge should give weight to preserving the appearance of impartiality."[46] "We review de novo the question of whether a judge

---

[43]    *See Mellard v. Mellard*, 168 P.3d 483, 489 (Alaska 2007).

[44]    294 P.3d 1056, 1063 (Alaska 2013).

[45]    *Id.* at 1063, 1066.

[46]    *Id.* at 1063 (footnotes omitted) (citing *Amidon v. State*, 604 P.2d 575, 577-

(continued...)

appears biased, which is assessed under an objective standard."[47] However, as we explained in *Greenway*, it is not obvious what standard of review — de novo review or abuse of discretion review — applies when a claim of actual bias is first raised on appeal and the trial court had no opportunity to address it.[48] Like in *Greenway*, we need not decide this issue here, as we would reach the same conclusion under either standard.

Mengisteab claims the trial court was "extremely bias[ed] and prejudice[d] and extremely harsh [in] ignoring [her] evidence and coming up with [its] own findings." She further claims that the judge had a conflict of interest in this case because "he was the Judge in [her] son's father['s] case when [the father] was arrested for a DUI in 2009."[49] Finally, she asserts that the judge "brought up several times [that] 'he doesn't know how I got the Supreme Court to overturn his decision,' " and that he told her lawyer, "She's rude, I don't like her and she does this all the time."[50] Unlike the appellant in *Greenway*, who cited five specific incidents in the record which she argued demonstrated judicial bias or the appearance of bias,[51] Mengisteab does not support her

---

[46]    (...continued)
78 (Alaska 1979)).

[47]    *Wells v. Barile*, 358 P.3d 583, 588 (Alaska 2015) (quoting *Sagers v. Sackinger*, 318 P.3d 860, 863 (Alaska 2014)).

[48]    *Greenway*, 294 P.3d at 1062-63.

[49]    Mengisteab does not specify, and the record does not indicate, which case this refers to.

[50]    Mengisteab does not explain which supreme court decision she is referring to, and the record does not indicate when she appeared before this court in the past. Mengisteab also does not explain what conduct the statement "she does this all the time" refers to.

[51]    *Greenway*, 294 P.3d at 1061-62, 1064-67.

contention with any citations to the record. In our review of the record, we found no incidents matching Mengisteab's description. On one occasion, the trial court did tell Mengisteab's attorney that it repeatedly "had to admonish [Mengisteab] to take her turn and she's just unwilling to do so," which bears some resemblance to Mengisteab's claim that the court told her lawyer "she does this all the time." However, it does not reasonably appear to reflect any personal bias against Mengisteab, does not suggest the trial judge considered Mengisteab rude, and does not indicate the judge disliked her personally. Rather, the court's statement may at most reflect simple frustration with Mengisteab's tendency — evident from the record — to interrupt the court, Oates, and her own counsel during court proceedings. Our review of the record also did not reveal any instances of the court ignoring evidence, and as discussed above, the court's factual findings were supported by the record and not clearly erroneous. Finally, even assuming that the judge was the presiding judge in a prior DUI case involving Mengisteab's son's father, this does not by itself give rise to a conflict of interest that would require recusal.[52]

Having reviewed the record and trial proceedings, we conclude that there is no indication of any bias or prejudice. The record instead indicates that the trial judge dealt fairly and courteously with both parties, and gave Mengisteab reasonable opportunities to explain her claims and evidentiary objections. Mengisteab's allegations appear to reflect only her general dissatisfaction with the trial court's rulings. As we have explained, allegations of judicial bias are unfounded where they are "simply another

---

[52]     *See Lacher v. Lacher*, 993 P.2d 413, 420-21 (Alaska 1999) (holding that a judge's involvement in past cases with negative outcome for the appellant personally did not require recusal).

iteration of [the appellant's] own discontent with the court's substantive rulings."[53] Accordingly, we conclude that Mengisteab's contentions are unwarranted.

## V.    CONCLUSION

We conclude that the superior court's failure to conduct a symmetrical best interests analysis was legal error and REMAND for a symmetrical best interests analysis consistent with this opinion.  We AFFIRM the superior court's decision in all other respects.

---

[53]     *Ward v. Urling*, 167 P.3d 48, 58 (Alaska 2007); *see also Greenway*, 294 P.3d at 1063("[E]ven incorrect rulings against a party do not show bias in and of themselves.").