NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JENNIFER MARSCHKE, | ) |
| | ) Supreme Court No. S-17851 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-19-09467 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| PATRICK L. DUNBAR JR., | ) AND JUDGMENT[*] |
| | ) |
| Appellee. | ) No. 1839 – July 21, 2021 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Jennifer Marschke, pro se, Haines, Appellant. No appearance by Appellee Patrick L. Dunbar Jr.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

## I.      INTRODUCTION

A couple separated and informally shared custody of their child. The mother later took the child to visit family in another state, with the father's written consent. The mother then kept the child beyond the agreed return date and filed a suit in the other state for sole custody. That court rejected jurisdiction; an Alaska court subsequently awarded the father custody during the school year and the mother custody during the summer. The mother challenges the superior court's custody decision,

---

[*]      Entered under Alaska Appellate Rule 214.

arguing that it erred in its best interests analysis. Seeing no error, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jennifer Marschke and Patrick Dunbar have one child, born in 2015. The family primarily lived in Haines, where Marschke worked as a special education teacher and Dunbar worked as a commercial fisher. Marschke and Dunbar never married; they separated in 2018 and shared custody of the child under an informal arrangement. In 2019 Marschke and Dunbar executed a travel consent form for her to take the child to New York for a few months to visit Marschke's father, who was ill.

### B. Proceedings

#### 1. New York

Shortly after Marschke arrived in New York, she filed a complaint asking the New York court to assert emergency jurisdiction and award her custody of the child. She alleged that Dunbar abused alcohol and was dangerous. The court conducted hearings, concluded that Marschke had not proved an "imminent risk of harm," and declined jurisdiction.

#### 2. Interim custody

Dunbar responded by filing a superior court complaint in Anchorage, seeking the child's return to Alaska and a formal custody arrangement; Marschke sought to keep the child in New York and to transfer venue from Anchorage to Haines. The court did not initially rule on Marschke's motion to transfer venue because of the pending New York case. By the time the court ruled on the motion, the case "ha[d] been in the works for a while" and the court had heard "quite a bit of testimony." It ultimately determined that the "delay" caused by transferring venue "would not serve the ends of justice" and denied the transfer.

At an interim custody hearing, Marschke primarily argued that Dunbar abused alcohol and that she was the child's primary caregiver. Dunbar acknowledged having used alcohol to cope with mental health issues, discussed counseling he had completed, and agreed to comply with any order requiring him not to use alcohol or drugs while caring for the child. Dunbar "completely den[ied] any allegations of any kind of violence or abuse." He described an altercation with Marschke, evidenced by a recorded conversation, in which she told him:

> [Y]ou know what's going to happen when I take him and when I leave? 30% of your income will come to me . . . . [Y]ou know what any judge is going to say to me . . . . I can leave . . . . You're on his birth certificate, but we're not . . . married . . . . Do you know how long a paternity test will take? Because I can take him out and say you're not his father . . . .

Marschke asserted that Dunbar had shoved her at the end of the recording. But Dunbar testified that Marschke had "lunged across the table to try to grab [the] phone [when she] saw that I was recording."

Addressing the statutory best interests factors,[1] the court found that most favored neither parent over the other. The court found there had been no domestic violence. And the court concluded that Dunbar's alcohol use was not an "ongoing" problem, especially because he had agreed to abstain from substance use while caring for the child. But the court found that when Marschke took the child to New York "her intent . . . was not to return" and that "leaving the state with the intent not to return" suggested she was unwilling to facilitate a meaningful relationship between Dunbar and the child.

---

[1]    *See* AS 25.24.150(c) (requiring court to "determine custody in accordance with the best interests of the child" and listing nine factors for consideration).

The superior court ordered that Marschke return the child to Alaska and prohibited Dunbar from drinking alcohol or smoking marijuana while caring for the child. The court granted 50/50 shared interim custody provided Marschke return to Alaska.

### 3. Permanent custody

A custody trial took place over several days in the summer of 2020. The court heard testimony from the parties, a variety of friends and relatives, a teacher, a police officer, and two bank employees who had witnessed an incident between the parties.

Marschke testified about her community of family and friends in New York. She testified about a school the child could attend, although she admitted that she may have misrepresented the child's residency to gain admission and that she had made the decision without Dunbar's input. She testified that she had been the child's primary caregiver during his early life. Marschke agreed that Dunbar was a "good dad" when he was sober. But she also testified that Dunbar drank excessively, that he drank in front of the child, and that his substance abuse predated the mental health issue for which he had received counseling. She testified that she had requested a police welfare check after seeing Dunbar driving with an open beer can in the car while he was supposed to be with the child. But the police officer testified that he neither smelled beer on Dunbar nor saw beer in Dunbar's possession during the check.

Dunbar testified about an extensive support community in Haines and introduced a dozen letters from community members attesting to his parenting abilities and their willingness to support him as a father. He said that he had arranged school for the child and that he believed it was important for the child to grow up in Alaska because of his Alaska Native heritage, although Dunbar could not identify any cultural event that he had attended with the child. Dunbar reiterated that he no longer drank alcohol to cope

with mental health issues. Dunbar acknowledged that Marschke generally is a good mother. He requested 50/50 shared custody if both parents were in Alaska; if Marschke remained in New York, he requested that he have the child for the school year and she have summer visitation.

Two witnesses testified about an incident between Marschke and Dunbar at a bank where they had the travel consent form notarized. A bank teller testified that Marschke became upset and loudly called Dunbar names, such as "drunk" and "drug addict." She also testified that Dunbar tried to calm Marschke, apologizing to the bank employees. Another bank employee corroborated this testimony, stating: "[Dunbar] was not loud, [Marschke] was the one who was loud, which caused pretty much anybody . . . in the [b]ranch . . . [to look and] find out what the outburst might be."

In an oral decision, the superior court found that both parents "care deeply about [the child]," that he has "loving . . . extended families on both sides," and that there was no clear evidence of either "parent [being] more qualified than the other." The court then made findings analyzing the best interests factors listed in AS 25.24.150(c):

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the

other parent and the child . . . ;

(7) any evidence of domestic violence . . . or a history of violence between the parents;

(8) evidence that substance abuse by either parent . . . directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

The court concluded that the first four factors did not weigh in either parent's favor; both were capable of meeting the child's needs, the child was too young to form a meaningful preference, and it was "obvious" that "love and affection" existed between the child and each parent.

Under the fifth factor, the court reasoned that stability "encompasses more" than geography and with whom the child has spent more time. The court acknowledged that the child had spent most of his life in Haines. Comparing the parents' jobs and considering relational stability, the court noted that because Dunbar is a commercial fisherman his "ability to spend meaningful time with [the child] during the summer is limited" and his "schedule is something that is really out of his . . . hands." The court found that the child "has lived in and knows Haines, Alaska more than any other place, and the people of Haines and the community of Haines more than any other place" so this factor "may weigh[] slightly in favor of Haines," but the court did "not put[] a lot of weight" on this factor.

The court more extensively discussed the sixth factor, willingness and ability to facilitate a relationship with the other parent, noting that Marschke had "demonstrated an . . . animosity that [the court] did not hear" from Dunbar; the court characterized Dunbar as speaking of Marschke in "respectful ways." The court also noted that Marschke was "deceptive" when she "left with the child" without "any intention of coming back." The court indicated that Marschke "may have moved [to

New York] with the best intention, [but] she didn't think through" the larger implications.  The court found that "this factor weighs in . . . Dunbar's favor" because Marschke's deception spoke poorly of her "willingness, or ability, to foster that . . . important relationship between . . . Dunbar and the child."

Addressing the seventh and eighth factors, the court noted that Marschke had made allegations of domestic violence in her New York complaint but that those allegations were "not substantiated" in either the New York proceedings or the Alaska proceedings.  Because the court "heard very little testimony . . . about domestic violence other than some allegations made by . . . Marschke," it found that domestic violence was not relevant.  The court pointed out that nearly all of the testimony suggesting Dunbar had a substance abuse problem came from Marschke.  The court credited contrary testimony from other witnesses and Dunbar's candid discussion of his history with alcohol and need for counseling.  The court found that Dunbar did not have an "ongoing substance abuse issue" that "would interfere with his ability to parent appropriately."

The court indicated under factor nine, other pertinent factors, that this case involved a "he said, she said" situation, particularly Marschke's allegations involving Dunbar's conduct.  The court therefore looked for "inconsistency" and found that "Marschke [had], on several occasions, misrepresented to the court . . . as . . . true . . . things that aren't true."  The court specifically noted the two bank employees' testimony directly contradicting Marschke's account of the bank incident as "an inconsistency that I do take into consideration when I'm determining whose testimony is more credible."  The court also noted that Marschke had not considered the child's best interests before taking him to New York and making substance abuse and domestic violence allegations against Dunbar.  But the court found that Marschke had been the child's primary caregiver and that, aside from the New York trip, nothing "would indicate that . . . Marschke is anything but a very good mother."

The superior court ultimately awarded joint legal custody and gave Dunbar primary physical custody for the school year in Alaska and Marschke summers with the child in New York.

Marschke filed a motion for reconsideration, which the superior court denied. Marschke, self-represented, appeals. She challenges the court's best interests analysis and its decision not to change venue from Anchorage to Haines. Dunbar has not participated in this appeal.

## III. STANDARD OF REVIEW

The superior court has broad discretion to make custody determinations.[2] We will set aside a custody determination only if a court's factual findings are clearly erroneous or if a court abused its discretion.[3] A factual finding is "clearly erroneous if, on the basis of the entire record, we are 'left with a definite and firm conviction . . . that a mistake has been made.' "[4] A superior court abuses its discretion by "consider[ing] improper factors," failing "to consider statutorily mandated factors," or assigning "disproportionate weight to particular factors while ignoring others."[5] We review de novo the superior court's symmetrical analysis required for custody decisions involving relocation.[6]

---

[2] *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011).

[3] *Id.*

[4] *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001) (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000)).

[5] *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

[6] *Saffir v. Wheeler*, 436 P.3d 1009, 1013 (Alaska 2019).

## IV. DISCUSSION

### A. Symmetrical Analysis Of The Best Interests Factors

In a custody case involving one parent wishing to relocate such that shared physical custody will not be feasible, the superior court first must determine whether the move is for a legitimate purpose.[7] In this case it was undisputed that Marschke's reason for relocating was legitimate. The court then decides "the custody arrangement that is in the best interests of the child."[8] The court must complete a symmetrical analysis of the best interests factors, first assuming that the move will happen, then "consider[ing] the consequences that the move will have on the child — both positive and negative."[9] In other words, the court must assess the consequences of the child both moving with the relocating parent and staying with the non-relocating parent.[10]

Marschke challenges several of the court's factual findings and the weight it gave the best interests factors.

#### 1. Factors one and two

Contending the court erred by finding that both parents were equally capable of meeting the child's needs, Marschke argues that Dunbar is not as capable a parent as she is. Marschke also contends that the court abused its discretion by "not giv[ing] more weight to [her] ability to provide for [the child's] education and the limitless opportunities present[] in New York."

Marschke's argument rests primarily on her own testimony, which the court called "inconsisten[t]." Dunbar presented strong evidence that he is capable of meeting

---

[7] *Id.*

[8] *Barrett*, 35 P.3d at 6.

[9] *Rego v. Rego*, 259 P.3d 447, 453 (Alaska 2011).

[10] *Saffir*, 436 P.3d at 1013.

the child's needs, including witness testimony and a dozen letters from community members. Marschke acknowledged that Dunbar is a "good dad" when sober. And Marschke presented no evidence that the child's education in Alaska would be deficient.

Evidence in the record supports the court's finding that "both parents . . . are capable." And the court did not err or otherwise abuse its discretion by declining to value New York life experiences over Alaska life experiences.

### 2.    Factor five

Marschke contends that the court overly relied on its factual finding about Haines being the child's primary residence and that it failed to consider the significant amount of time the child spent in other locations. Marschke also contends that the "[c]ourt gave very little, if any, weight to [the child's] relational stability" and that the court should have given more weight to her having been the child's primary caregiver. She challenges the court's failure to specifically address the impact of removing the child from her, the primary caregiver.[11] Marschke cites *Mengisteab v. Oates*[12] and *Saffir v. Wheeler*[13] as support for her argument that the court was required to consider the effects of removing the child from his primary caregiver.

Even assuming Marschke's representations of the time the child spent outside Alaska are accurate, the superior court based its finding that Haines was the

---

[11]    *See id.* (requiring symmetrical analysis of consequences to child of remaining with parent in current location or moving with relocating parent).

[12]    425 P.3d 80, 89 (Alaska 2018) (requiring court to consider consequences to child of living with each parent in separate locations despite one parent's failure to facilitate child's relationship with other parent).

[13]    436 P.3d at 1014 (finding symmetrical analysis inadequate after court focused on mother's unwillingness to facilitate child's relationship with father but "did not address the impact of" child's removal from care of "primary custodian" and established routine).

child's primary residence on his relationship to "the people" and "community." Despite not making some specific statements about emotional bonds, the court considered the child's relational stability with each parent. The court discussed how work will affect each parent's relationship with the child. The court found that because Dunbar works as a fisher, he cannot spend time in the summer with the child; because Marschke works as a teacher, she likely will have more available time during the summer. And the court noted that if the child were with Marschke for the school year, he would have no access to either parent during the summer; if he were with Dunbar during the school year, he would have full access to Dunbar all winter and, even if Marschke works year around, at least some access to her all summer, thereby allowing the child a stable relationship with each "caring and equally capable" parent. The court may have placed less emphasis on the stability factor because it found that both parents were "equally situated to care for [the child's] needs" and had "equally strong support network[s]."

Although the court did not directly address the emotional effects of removing the child from either parent for part of the year, the court discussed how each parent's job would affect the child's relational stability in each location and acknowledged the child's community and family relationships in both locations.[14] The court thus considered the consequences to the child of living with the parent in New York or the parent in Alaska. And courts have discretion to "determin[e] the importance of each statutory factor."[15]

---

[14] We note that under most circumstances courts completing a symmetrical analysis should explicitly discuss the emotional effects (and the impact on relational stability) of removing a child from each parent. *See Mengisteab*, 425 P.3d at 88.

[15] *Andrea C. v. Marcus K.*, 355 P.3d 521, 528 (Alaska 2015) (quoting *Williams v. Barbee*, 243 P.3d 995, 1005 (Alaska 2010)).

### 3. Factor six

Marschke contends that the superior court erred in its findings about her demeanor, arguing that she was not disrespectful to Dunbar. She contends that Dunbar also was disrespectful and "show[ed] animosity and disdain" by telling the child and other people in the community that she had kidnaped the child. She also contends that the court did not give enough weight to her efforts at facilitating Dunbar's relationship with the child prior to going to New York. And she further contends that the superior court should have more heavily weighed Dunbar's "ostracism of Marschke to the Haines community." Marschke also challenges the finding that she did not intend to return the child to Alaska, arguing that the kidnaping "narrative is simply a distraction."

The court heard a recording of Marschke that included name-calling and a threat to improperly manipulate the legal process for establishing paternity. The court also heard testimony that Marschke publicly called Dunbar a drug addict and alcoholic, tarnishing his reputation in the community. Dunbar testified: "[I]t's a pretty fine line between what [Marschke] did and kidnaping. . . . [But] I don't believe I've used that word to [the child]." Another witness testified that it was not Dunbar but someone else in the community who called Marschke a kidnaper on social media.

Marschke's friend testified that Marschke said "she would not be bringing [the child] back to Alaska." It is uncontested that Marschke initialed the return date on the notarized travel consent form but then kept the child out of the state *after* a New York court concluded that Dunbar posed no risk of imminent harm. Evidence supports the superior court's findings that Marschke exhibited disrespect for Dunbar and that she did not intend to return the child to Alaska; the findings therefore are not clearly erroneous.[16]

---

[16]     *See Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) ("[W]e will not reweigh evidence when the
(continued...)

### 4. Factor seven

Marschke notes in her statement of issues that the superior court "erred in not giving enough weight to the testimony heard in [New York], and further disallowed [Marschke's] attorney to revisit the domestic violence and jurisdiction testimony." But she neither mentions domestic violence elsewhere in her brief nor cites relevant authority. Marschke's domestic violence arguments are inadequately briefed: "We do not consider arguments that are inadequately briefed. . . . Even a pro se litigant . . . must cite authority and provide a legal theory."[17]

### 5. Factor eight

Marschke suggests that the superior court's factual finding about Dunbar's substance abuse is clearly erroneous.[18] Marschke essentially argues that the court believed the wrong witnesses.

The court found at the interim custody hearing that Dunbar did not have an ongoing substance abuse problem, and in its final custody order acknowledged that Dunbar may have abused alcohol in the past but concluded that his current substance use was not problematic. Substantial testimony supports the court's finding, including Dunbar's admission that he previously used alcohol to cope with mental health issues but

---

[16] (...continued) record provides clear support for the superior court's ruling.").

[17] *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062-63 (Alaska 2005) (emphasis omitted); *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

[18] Marschke includes this argument in the section of her brief relating to a parent's willingness to facilitate a relationship with the other parent. But she essentially argues that the court erred by failing to find that Dunbar has a substance abuse problem, which is properly analyzed under factor eight.

that he had completed counseling to address those issues. Other witnesses testified that he did not have a drinking problem. A family friend testified that Marschke had never complained to her about Dunbar's substance use. And a police officer testified that he neither saw nor smelled alcohol during a welfare check Marschke requested. The court found that almost all testimony suggesting a substance abuse problem came from Marschke's testimony and that Dunbar presented testimony about his current substance use from other witnesses and candidly discussed his history. And the court found that Marschke had "misrepresented as . . . true . . . things that aren't true." Conflicting evidence usually is not enough to render a factual finding clearly erroneous,[19] and the record supports the superior court's finding.

### 6. Factor nine

Marschke asserts that factor nine, encompassing other pertinent considerations, "was misapplied." All but one of her arguments — that she is credible — have been discussed in connection with other factors.

The superior court did not clearly conclude that factor nine favored either party, instead saying it was not "necessarily a direct factor." The court discussed the relative credibility of Dunbar and Marschke, concluding that her testimony had been inconsistent and therefore was less reliable. The court specifically identified oral testimony from two disinterested witnesses directly contradicting Marschke's testimony about the bank incident. Marschke testified that she did not have an outburst at the bank. But two bank employees testified that Marschke had an outburst, and one testified that Marschke was "agitated" and called Dunbar an "addict."

---

[19] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011).

We defer to the superior court's witness credibility determinations, and we give "particular deference" to factual findings "based primarily on oral testimony."[20] The court therefore did not err by concluding that Marschke's testimony generally was less credible than Dunbar's.

### 7. Conclusion

The superior court considered all the statutory factors and weighed the most relevant factors; although the court found that most factors were equal or carried little weight, the court found that Dunbar was the parent most willing to promote the child's relationship with the other parent. The court has discretion to weigh evidence supporting its best interests analysis,[21] and conflicting evidence usually is not enough to render a factual finding clearly erroneous.[22] Because evidence in the record supports the court's findings, they are not clearly erroneous.[23]

### B. Venue

Marschke contends that the court abused its discretion by denying her motion to change venue from Anchorage to Haines. She argues that "the convenience of . . . witnesses" and "the ends of justice" would have been promoted by the change.

---

[20] *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[21] *Stephanie W. v. Maxwell V.*, 274 P.3d 1185, 1192 (Alaska 2012) ("The superior court has wide discretion to ascertain a child's best interests and to weigh the best interests factors."); *Silvan v. Alcina*, 105 P.3d 117, 122 (Alaska 2005) ("When the superior court is faced with conflicting evidence, we do not re-weigh it.").

[22] *Christina J.*, 254 P.3d at 1103.

[23] *See Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) ("[W]e will not reweigh evidence when the record provides clear support for the superior court's ruling.").

Marschke lived in New York when the complaint was filed and thus could not "be personally served within a judicial district" in Alaska.[24] Under Alaska Civil Rule 3(e), Dunbar's action thus could "be commenced in any judicial district of the state." Dunbar filed his complaint in Anchorage, and Marschke subsequently filed a motion to change venue to Haines. She argued that neither party resided in Anchorage, that it would be helpful to e-file (which apparently was available in Haines but not Anchorage at the time), and that it would be burdensome for witnesses to testify in Anchorage.[25]

The superior court initially did not rule on Marschke's motion because of the pending New York case. By the time the court ruled on the motion, the case "ha[d] been in the works for awhile" and the court had heard "quite a bit of testimony." The court pointed out that Marschke's New York witnesses would be telephonic no matter where the case was heard and noted that it could "accommodate" Marschke's e-filing concerns. It ultimately determined that the "delay" caused by transferring venue "would not serve the ends of justice" and denied the transfer.

We review decisions not to transfer venue from one proper venue to another for abuse of discretion.[26] Marschke is correct that no witnesses were in Anchorage and that e-filing may have been easier in Haines; the superior court acknowledged this. But Marschke's plan to stay in New York during trial undercuts her argument because, as the court noted, she and many of her witnesses planned to appear telephonically from New York regardless of venue. Although e-filing would have been convenient, the court

---

[24]    Alaska R. Civ. P. 3(c).

[25]    *See* AS 22.10.040 (enumerating reasons for granting change of venue).

[26]    *Brooks Range Petroleum Corp. v. Shearer*, 425 P.3d 65, 70 n.5 (Alaska 2018).

explicitly agreed to work with Marschke on the e-filing issue.  And Marschke's decision to file a New York case delayed the Alaska case and caused the court to develop significant familiarity with the proceedings before ruling on the motion to transfer.  The court's decision to retain jurisdiction was not an abuse of discretion.

## V.    CONCLUSION

The superior court's decision is AFFIRMED.