Faith M. MOELLER–PROKOSCH,
Appellant,

v.

Chuck F. PROKOSCH, Appellee.

No. S–11146.

Supreme Court of Alaska.

Oct. 1, 2004.

David A. Golter, Golter & Logsdon, P.C., Wasilla, for Appellant.

No brief filed by Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

This appeal is the third arising from a superior court's initial custody order conditioning custody upon the relocation of a parent. We decided in the first appeal that the superior court cannot place restrictions on a parent's ability to relocate, but rather must make a custody determination in light of each parent's situation, taking into consideration all factors related to the best interests of the child. We concluded in the second appeal that the superior court erred on remand in failing to make a custody determination based on an assumption that the mother would relocate and in failing to make a finding whether legitimate reasons motivated the mother's decision to relocate. The mother now appeals the latest custody order, which awards primary physical custody to the father assuming the mother relocates out of Alaska. Because we conclude that it was error to fail to consider pertinent consequences of the mother's assumed relocation, we vacate the custody award and remand this matter for further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

This case has come before us twice before. The superior court's initial custody order found that each of Jeremiah Ezekiel Prokosch's parents, Faith Moeller–Prokosch and Chuck Prokosch, would be capable of exercising sole legal custody, but gave primary physical custody to Faith based on her flexible employment. The superior court also concluded, however, that because Faith had indicated a desire to move to Florida, thus necessarily separating Jeremiah from his father in Alaska, she demonstrated an unwillingness to meet his emotional needs. It therefore ordered that the parties share joint legal custody, specified extensive visitation procedures, and ordered that Faith not relocate Jeremiah to any place more than sixty-five miles from Chuck.[1]

Faith appealed the superior court's order containing this limitation on her relocation.[2] We vacated the order and remanded, holding that the superior court must consider all of the AS 25.24.150(c) best interest factors in awarding custody if one parent chooses to move from Alaska, and must also consider whether legitimate reasons for the move exist.[3]

The superior court on remand modified the original custody order by awarding sole legal custody to Chuck with respect to where Jeremiah would attend school, physical custody to Faith as long as she resided within a reasonable traveling distance to Jeremiah's school in Alaska, and primary physical custody to Chuck if Faith chose to live at an unreasonable traveling distance to the school. Faith again appealed.

We again vacated the custody order and remanded for further proceedings including an evidentiary hearing to consider subsequent developments since the original trial. We reasoned that the superior court failed to follow our instructions on remand to make a finding as to whether legitimate reasons existed for Faith's move and to apply the best interest analysis based on the assumption that Faith would move to Florida.[4]

After our second remand, the superior court conducted an evidentiary hearing and found that Faith's reasons for moving to Florida were legitimate and were not intended to frustrate Chuck's visitation. The superior court also performed the best interest analysis of factors listed in AS 25.24.150(c), and found that (1) Jeremiah's needs were typical of those of any nine-year-old boy growing up in the Mat–Su Valley; (2) both parents were capable of meeting his needs; (3) due to Jeremiah's young age, no preference was considered or presented; (4) strong love and affection existed between him and each parent; (5) it was in Jeremiah's best interests to remain in Southcentral Alaska to maintain stability and continuity; (6) Chuck was more willing than Faith to allow Jeremiah to have an open and loving frequent relationship with the other parent; (7) there was no evidence of domestic violence, child abuse, or neglect; (8) Chuck had "cleaned up his life" with regard to his former problem with alcohol; and (9) Jeremiah would be devastated if he had to move to Florida away from his father. Based on these findings, the superior court entered an order stating that, assuming Faith moves to Florida, Chuck would gain primary physical custody.

After Faith moved for partial reconsideration to request a custody ruling in the event she remained in Alaska, the superior court ordered that as long as Faith remained in the Mat–Su Valley, she would continue to have primary physical custody of Jeremiah. Because she had no intention of leaving Alaska without Jeremiah, Faith stipulated to entry of final judgment that indicated the parties did not wish to further litigate the visitation issue at the time. The superior court entered a final decree, incorporating its previous orders and some elements of its initial custody order.

Faith now appeals this decree.[5]

1. *Moeller–Prokosch v. Prokosch (Moeller I)*, 27 P.3d 314, 316 (Alaska 2001).

2. *Id.*

3. *Id.* at 316–17.

4. *Moeller–Prokosch v. Prokosch (Moeller II )*, 53 P.3d 152, 157 (Alaska 2002).

5. No attorney has appeared for Chuck, and Chuck has filed no brief in this appeal.

## III. DISCUSSION

### A. Standard of Review

 Whether a lower court on remand has correctly applied our mandate is a question of law we review de novo.[6] We determine questions of law in light of precedent, reason, and policy.[7]

 We set aside a trial court's determination of custody "only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[8] A fact finding "is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake."[9] An abuse of discretion has occurred if the trial court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[10]

### B. The Superior Court Erred in Failing To Analyze Jeremiah's Best Interests Based on the Assumption Faith Would Move to Florida.

 We first remanded this case for a determination whether it would be in Jeremiah's best interests to be in the physical custody of Faith or Chuck, based on the assumption that Faith would move to Florida.[11] Alaska Statute 25.24.150(c) requires the court to consider these factors in determining custody in accordance with the child's best interests:

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

Faith challenges the superior court's findings with respect to statutory factors (2), (5), (6), (7), and (9).

 With respect to the fifth statutory factor, Faith argues that the superior court focused too narrowly on geographic stability in weighing this factor against her. We agree. The stability factor requires the court to engage in a comprehensive review of several aspects of continuity. As we explained in *Barrett v. Alguire:*

> The trial court's consideration of the stability of the children's environment in a custody . . . case can encompass a multitude of factors, including, but not limited to, the relationship with the custodial parent, the home provided by the custodial parent, the children's school, the community of friends and family, the cultural community, and the children's relationship with the non-custodial parent. It also includes stability of place.[12]

The stability factor also requires the court to view stability and continuity both prospec-

6. *Moeller II,* 53 P.3d at 154.

7. *Moeller I,* 27 P.3d at 316 (citing *McQuade v. McQuade,* 901 P.2d 421, 423 n. 3 (Alaska 1995)).

8. *Hamilton v. Hamilton,* 42 P.3d 1107, 1111 (Alaska 2002).

9. *Id.; Fardig v. Fardig,* 56 P.3d 9, 11 (Alaska 2002).

10. *Hamilton,* 42 P.3d at 1111.

11. *Moeller II,* 53 P.3d at 153.

12. *Barrett v. Alguire,* 35 P.3d 1, 9 (Alaska 2001).

tively and retrospectively.[13] We specifically addressed in *Meier v. Cloud* how to apply this factor in situations such as Jeremiah's, in which two parents share custody and one subsequently decides to relocate to another state:

> Because the child will no longer be able to spend equal time with each parent in these situations, a court considering the child's need for continuity and stability in this context must examine not only the desirability of maintaining geographical continuity, but also the importance of maximizing relational stability. A continuity test centered entirely on the child's geographical stability would always favor placing the child with the non-moving parent. Yet our decisions recognize that courts may properly award primary custody to the relocating parent when that parent offers superior emotional stability. Thus, the continuity and stability factor does not preordain the result in such cases; instead, it commands a comprehensive inquiry into "each parent's respective ability to maintain stable and satisfactory relations between themselves and the child." [14]

Because Jeremiah has strong geographical ties to Alaska, focusing only on the geographical consequences of Faith's move to Florida would clearly favor granting custody to Chuck.[15] We have noted, however, that "[s]tability is often a function of parental attitude and not of geography." [16]

The court-ordered notebook through which the parents communicate shows that both parents provide Jeremiah with a constant stream of activities such as reading, swimming, skating, cooking, playing video games, spending time with friends, and attending church. Faith has been Jeremiah's primary caretaker since the divorce in 1999; he spends most if not all of the school week with her. She closely monitors his daily activities and has provided a stable environment for him. Chuck, however, has also maintained a constant relationship with Jeremiah. As noted by the superior court, he regularly exercised all of his weekend visitation rights "in exemplary fashion," even when he lived in Anchorage while Faith and Jeremiah lived in Palmer.

As part of considering Jeremiah's best interests in terms of relational stability, the superior court should have fully considered the effect of his separation from the non-custodial parent, assuming his mother moves to Florida. The superior court did recognize that Jeremiah would be devastated if he had to move to Florida away from Chuck, but did not discuss the corresponding effect on Jeremiah if he had to stay in Alaska after Faith moved to Florida.[17] As shown by the testimony of both Faith and Chuck, it is undisputed that Jeremiah would be devastated by either custody choice: living in Alaska without his mother or living in Florida without his father. This testimony was consistent with the finding that Jeremiah is strongly bonded to both parents.

We conclude that it was an abuse of discretion not to consider the detriment to Jeremiah if he were separated from his mother upon her move to Florida. The absence of any discussion of this consequence raises some question whether the best interests analysis was based on the assumption that Faith would move to Florida, as we required in remanding.[18] Performing the best inter-

---

13. *Meier v. Cloud,* 34 P.3d 1274, 1279 (Alaska 2001).

14. *Id.* (footnotes omitted) (quoting *McQuade v. McQuade,* 901 P.2d 421, 426 (Alaska 1995)).

15. Jeremiah has lived in Southcentral Alaska all ten years of his life, attending the same school in the Mat–Su Valley since elementary school. He has friends with whom he spends time when he is in the custody of either parent, and he participates in a local church program and the local Boy Scouts.

16. *McQuade,* 901 P.2d at 426 (quoting *Craig v. McBride,* 639 P.2d 303, 308 (Alaska 1982) (Rabinowitz, C.J., concurring)).

17. The superior court discussed the devastating impact of being separated from his father as part of the ninth statutory factor, but because it involves relational continuity, the impact of separation is more properly considered as part of the stability analysis under the fifth statutory factor.

18. At one point during the evidentiary hearing, the court asked Faith:
> [W]hy—given how long that's been on hold anyway, and given ... that Jeremiah is ... a

ests analysis based on Faith's assumed move requires symmetric consideration of the consequences to Jeremiah both if she leaves with him and if she leaves without him.

## C. The Superior Court Did Not Err in Finding Each Parent Desired and Was Equally Capable of Meeting Jeremiah's Needs.

■ Faith also argues that the superior court incorrectly determined under the second statutory factor that both parties were equally adequate despite evidence of Chuck's inferior housing, his failure to make use of all of his mid-week visitation privileges, his failure to pay regular child support, and his minimal participation in Jeremiah's schooling and counseling. We conclude that the superior court did not err in finding that the parties offer different but comparable ways of meeting Jeremiah's needs.

Chuck admittedly lives in a large two-bedroom trailer with no running water and no central heat, but he heats his home with a wood stove and keeps 100 gallons of water on hand for the toilet and other household uses. Faith lives in a housing project in Palmer. Regardless, both parents have housing adequate to provide Jeremiah with basic necessities.

Chuck's failure to exercise all of his Wednesday mid-week visitation privileges is also insufficient to show that he is less capable than Faith of meeting Jeremiah's needs. The superior court found that "he did avail himself of all the weekends in exemplary fashion." Chuck also testified that Wednesday visits were sometimes difficult due to his work and that he had unsuccessfully attempted to exchange days with Faith. Under these circumstances the superior court could properly find that Chuck's exemplary weekend visitation record outweighs his imperfect Wednesday visitations.

With respect to Faith's allegations that Chuck did not pay regular child support, Chuck testified that every time he found employment, he made arrangements to make up the child support he was unable to pay while unemployed. Chuck has also provided Jeremiah with clothes, video games, toys, and a laptop computer in addition to child support.

Faith, however, has been more active in Jeremiah's counseling and education. Faith sought counseling for Jeremiah after he displayed anger and had difficulty adjusting to the divorce, and she continued his counseling beyond the year ordered by the court. She also closely monitors Jeremiah's homework and his academic progress. Chuck, on the other hand, apparently had difficulty reaching Jeremiah's counselor but did manage to speak to her once about him. Chuck made an effort to go to Jeremiah's school to speak with his teacher and volunteer with the class but upon returning to the school a second time was informed that because of the divorce decree he would not be permitted to visit Jeremiah during the school day. Faith testified that she is more "book smart," but Chuck testified that he and Jeremiah do artistic activities and educational programs on the computer together.

Some of the ways in which Faith participates in Jeremiah's life more than Chuck relate to her role as the primary physical custodian. Because Jeremiah lives with her during the school week, she would naturally be more involved in monitoring his homework and taking him to counseling. Furthermore, it appears that Faith has interfered to some extent with Chuck's ability to participate in Jeremiah's life. She does not inform Chuck about Jeremiah's Boy Scout events and also has prevented Chuck from

little boy ... [who] loves his dad, loves his mom, but who does get to see his dad a lot, I mean, he's not a little boy who doesn't have any dad relationship ... why can't you wait just a few more years so that Jeremiah can spend his childhood with his dad in his life, at least as much as he is in his life, which isn't as much as you're in his life, but a whole lot more than he would be if you went to Florida? Why can't you wait until he's an older—I don't want

to say all teenagers do this, but once they hit the teenage years and they don't really want mom or dad in their life ... why is it so important to do this now as opposed to let Jeremiah have at least a few more years with his dad while he's still a little boy?

This line of questioning further suggests possible preoccupation with the irrelevant question whether Faith should be permitted to relocate, rather than the impact of her assumed move.

participating in Jeremiah's church program by asking a minister to tell him not to attend.

Because the evidence permits a finding that Faith and Chuck respond to Jeremiah's needs and approach parenting in different but equally adequate ways, it was not an abuse of discretion for the superior court to find, as a whole, that both parties equally desired and equally were able to meet his needs.

### D. The Superior Court Did Not Err in Finding that Chuck Was More Willing and Able To Allow Jeremiah an Open and Loving Relationship with the Other Parent.

■ The superior court weighed the sixth statutory factor in favor of Chuck, based on information presented at the hearing and contained in the 1999 custody investigation report; in the superior court's view, the information indicated that Faith's inflexibility with respect to minor changes or short delays in visitation failed to promote Chuck's participation in Jeremiah's life.

The evidence presented at the hearing supported an inference that Faith shows extreme adherence to the initial custody order with regard to any contact between Chuck and Jeremiah. Under that order, each parent can make a ten-minute phone call to Jeremiah no more than once every forty-eight hours while he is in the custody of the other parent. Chuck testified that in the three years since the divorce, Faith never allowed him to talk to Jeremiah on the phone two days in a row, even with respect to Chuck's birthday or Father's Day. According to him, Faith refuses to let Jeremiah speak to Chuck longer than ten minutes even though Chuck permits him to speak with Faith as long as he wants. Chuck also testified that Faith refuses to facilitate email communication between him and Jeremiah.

The evidence supports the trial court's finding that Faith exhibited a lack of flexibility with visitation arrangements, resulting in "minor changes or short delays concerning the time and location of visitation pick-up and drop off [and] the provision of extra visitation. . . ." For example, she has not facilitated Chuck's Wednesday visits. She refuses to let Chuck trade days and has refused to allow Wednesday visitation in the summertime. Chuck has allowed Jeremiah to be with his mother on holidays that are technically Chuck's visitation days, but Faith has never reciprocated. Chuck testified that Faith would not allow Jeremiah to take to her house the laptop given by Chuck on which Jeremiah writes stories. Similarly, Faith does not allow Jeremiah to wear the clothes from his father's house back to her house, forcing Chuck to maintain a separate set of clothes, hats, gloves, and boots at his home. Because of Faith's insistence that all items from Chuck stay at Chuck's place, all birthday and Christmas presents also remain at the respective homes.

The evidence thus supports the superior court's finding that "Faith is very inflexible in her dealings with Chuck and the child." The superior court therefore did not err in finding Chuck to be "more willing and able to allow" Jeremiah to develop "an open and loving frequent relationship" with his mother than vice-versa.

### E. The Superior Court Did Not Err in Failing To Find Evidence of Domestic Violence.

■ Faith also argues that following trial in December 1999 the superior court did find evidence that there was some domestic violence by Chuck against Faith. She contends that the superior court should have considered this fact to the extent the court faulted Faith for the current relationship between the parties. But because the superior court did not weigh this factor against either party, there is no indication the factor did affect (or should affect, as conceded by Faith) the custody decision. We therefore conclude that the superior court did not err in failing to find evidence of domestic violence.

## IV. CONCLUSION

Because the superior court did not perform a complete analysis of Jeremiah's best interests based on the assumption that Faith would move to Florida, we VACATE the

custody order and REMAND for proceedings consistent with this opinion.