*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| J.M., | ) | |
| | ) | Supreme Court No. S-18650 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-05668 CI |
| v. | ) | |
| | ) | O P I N I O N |
| S.C., | ) | |
| | ) | No. 7707 – July 19, 2024 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances:  Lynda A. Limón, Limón Law Firm, and Randi R. Vickers, Law Office of Randi R. Vickers, Anchorage, for Appellant.  Notice of non-participation filed by Jennifer Wagner, Seaver & Wagner LLC, Anchorage, for Appellee.

Before:  Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices.  [Carney, Justice, not participating.]

MAASSEN, Chief Justice.

## I.      INTRODUCTION

Divorcing parents entered into a custody settlement agreement providing for shared custody of their child in Alaska until 2022, when he would move to the state where his mother wished to relocate.  The superior court approved the settlement agreement and, in a later ruling, its relocation provision.  The father then moved to

modify custody, arguing that the deterioration in the child's emotional and behavioral health constituted a substantial change in circumstances and that the planned move out of state would have a detrimental effect on the child's progress in therapy and school. The superior court agreed, finding that circumstances had changed substantially since the time of the original custody agreement, that the child's best interests favored staying in Alaska, and that the father should have primary physical custody.

The mother appeals, challenging the superior court's finding of a substantial change in circumstances, its best interests analysis, and its decision to admit a parenting coordinator's report into evidence at trial. Finding no clear error or abuse of discretion in the best interests analysis and no harm from the admission of the parenting coordinator's report, even if erroneous, we affirm the superior court's custody decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

J.M. and S.C. were married in 2006 and moved to Alaska in 2010 after completing medical school and residencies.[1] J.M.'s family lives in New Jersey, and while J.M. lived in Alaska she maintained some part of her practice on the East Coast, staying there for extended periods of time. The couple's son was born in Alaska in 2013. When he was about a year old, J.M. and her mother, a former special education teacher, began to suspect that he had attention deficit/hyperactivity disorder (ADHD).

The parties both filed for divorce in early 2014, S.C. in Alaska and J.M. in New Jersey, but they eventually dropped their actions in favor of a collaborative process. J.M. returned to Alaska to live so they could share custody of the child under an informal agreement.

---

[1] We granted a request that the parties be referred to by their initials.

J.M. and S.C., both represented by counsel, negotiated a custody settlement agreement and signed it in February 2016. Under the agreement they would share both physical and legal custody. The child would continue to live in Alaska through July 1, 2022, during which time the parents would share physical custody on a "5-2-2-5" basis. The child would then move to New Jersey, where he would remain until entering ninth grade in 2028. At that time the parties would meet again with a neutral facilitator and child specialist to determine, among other things, whether the child would complete high school in New Jersey or Alaska. Future disputes would first be presented for resolution to a parenting coordinator. The agreement also included a non-modifiability clause, which stated that "[a]ny attempt by either parent to modify the terms of this agreement with respect to [the child's] relocation to New Jersey should be rejected absent" unanticipated circumstances "detrimental" to the child.

From 2016 to 2019 the child struggled with preschool and was expelled from at least two programs because of his severe emotional issues. The child began counseling in 2017 with a child psychologist. She recommended a formal evaluation, which was initiated by a clinical psychologist; the testing could not be completed, however, because of the severity of the child's behavior.

## B.    Proceedings

S.C. filed for divorce in Alaska in March 2019, and J.M. did not contest it. That October the parties amended the 2016 custody agreement to continue their equal parenting time on a "week on/week off" schedule.

### 1.    Court approval of custody settlement agreement

S.C. and J.M. asked the court to sign the 2016 custody agreement while withholding judgment on the issue of whether the child should relocate to New Jersey in 2022 as the agreement contemplated. S.C.'s counsel informed the court that S.C. now did "not believe that a move out of state [was] still in the child's best interests" and

that S.C. therefore intended to challenge the relocation provision's enforceability. Accordingly, the court signed the 2016 agreement and its 2019 amendment, concluding that both were in the child's best interests, but noting that the "agreement does not resolve the relocation issues which will be subject to further briefing."

### 2. Enforceability of the relocation provision

After further briefing the court decided that the relocation provision was enforceable. The court concluded that the 2016 agreement met "all the traditional contractual requirements," that "[p]ublic policy in Alaska has long favored settlement agreements," and that there were no "red flags" that would justify deviating from the agreement's provisions. The court noted S.C.'s argument that the court should conduct "a more thorough best interests analysis" but concluded that if S.C. wanted to challenge the move, he would need to "file a properly framed motion [to modify custody] with supporting documentation." Such a motion, the court observed, "will have to demonstrate a substantial change in circumstances not contemplated by the 2016 Settlement Agreement" — arguably a different standard than that required by the agreement itself, which mandates a showing of "circumstances clearly not anticipated by the parties and detrimental to [the child]."

S.C. filed a motion to modify custody in November 2021, asking the court "to modify custody to allow [the child] to continue to live primarily with him in Alaska" rather than move to New Jersey as contemplated by the parties' agreement. J.M. opposed the motion. The trial took place over ten days in March, April, and July 2022.

### 3. Motion in limine

During the course of the trial J.M. filed a motion in limine arguing, among other things, that the parenting coordinator should be precluded from testifying and that her reports were inadmissible because of their confidentiality. S.C. opposed the motion; he asserted that he had no intention of calling the parenting coordinator as a witness

except as might be necessary to authenticate documents, but that her reports could fairly be considered as evidence and had already been shared with both parties, their counsel, and the court. After soliciting the parenting coordinator's opinion on the matter, the court ruled that she would not testify, but that her reports to the court served an important advisory purpose and could not be disregarded.

### 4. Order granting modification of custody

S.C., J.M., and a number of other witnesses testified during the custody trial. Afterwards the superior court issued an interim order that the child "shall not be relocated to New Jersey with his mother . . . until further order of this court."

In its final order the court addressed J.M.'s move to New Jersey and its consequences for the child. The court first found that the move was legitimate and "not intended to stifle [S.C.'s] relationship with [the child]" or "make visitation more difficult." The court noted that J.M.'s "family lives in New Jersey," where there was also a higher demand for J.M.'s medical specialty. The court next concluded that its analysis of whether or not there had been a substantial change in circumstances — such that a modification of the custody agreement could be justified — would be based on changes between the signing of the agreement in 2016 and the trial, not just changes after the signing of the March 2021 order on the agreement's enforceability. The court found that S.C. had demonstrated a substantial change of circumstances related to the child's wellbeing because even if the parties "suspected that [the child] might have ADHD as early as 2016, it did not manifest into the 'severe emotional disturbances that he is unable to regulate' until several years later."

The court then conducted the "symmetric analysis" of the child's best interests required when one parent seeks to move out of state.[2] It found that three factors favored S.C.: each parent's capability and desire to meet the child's needs,[3] the length of time the child had lived in a stable environment,[4] and each parent's willingness to facilitate and encourage a relationship between the other parent and the child.[5] The court found that the remaining factors listed in the governing statute were either neutral or inapplicable.

Having weighed the relevant factors, the court concluded that if J.M. moved to New Jersey it would be in the child's best interests to stay in Alaska with S.C. It reasoned that the child "need[ed] continued stability and continuity of care" and was "not in a place where the court believes he [could] handle the upheaval of a cross-country move, and the change from his established school support and therapeutic team." The court further stated that the question of when the child *could* move to New Jersey as contemplated by the 2016 agreement "will depend entirely upon [the child], and his response to continued therapeutic interventions," to be demonstrated in the future by updated professional evaluations and recommendations. The court therefore awarded primary physical custody to S.C., leaving joint legal custody unchanged.

J.M. appealed. S.C. is not participating in the appeal.

---

[2] *See Mengisteab v. Oates*, 425 P.3d 80, 88 (Alaska 2018) (explaining that when parent moves out of state, symmetric analysis requires consideration of child's best interests both if child stays and if child goes with moving parent).

[3] *See* AS 25.24.150(c)(2).

[4] *See* AS 25.24.150(c)(5).

[5] *See* AS 25.24.150(c)(6).

## III. STANDARD OF REVIEW

"A trial court has broad discretion in deciding child custody issues."[6] We will "set aside a trial court's determination of custody 'only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion.' "[7] When reviewing the superior court's best interests analysis, we "review the individual findings for clear error and how the factors were balanced for abuse of discretion."[8] "A factual finding is 'clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made.' "[9] The superior court's "discretion extends to its determination whether, following an evidentiary hearing, the moving party has proven a substantial change in circumstances, meaning one that affects the child's welfare."[10]

We review the superior court's decisions on the admissibility of evidence for abuse of discretion and reverse only if the error was not harmless.[11]

## IV. DISCUSSION

J.M. raises several challenges to the superior court's order modifying custody. The first is that the superior court failed to give sufficient weight to the parties' 2016 settlement agreement in its analysis of whether there had been a substantial change of circumstances that could justify a modification. The second is that the court erred in

---

[6]     *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010).

[7]     *Moeller-Prokosch v. Prokosch* (*Moeller-Prokosch III*), 99 P.3d 531, 534 (Alaska 2004) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[8]     *Brett M. v. Amanda M.*, 445 P.3d 1005, 1009 n.9 (Alaska 2019).

[9]     *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 264 (Alaska 2021) (quoting *Dara v. Gish*, 404 P.3d 154, 159 (Alaska 2017)).

[10]     *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016).

[11]     *Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 328 (Alaska 2012).

several aspects of its best interests analysis. And the third is that the court erred by admitting and relying on the parenting coordinator's reports.

## A. The Superior Court Properly Considered Whether There Had Been A Change In Circumstances Justifying A Custody Modification.

The core of J.M.'s argument is that "custody settlement agreements should be enforced absent extraordinary circumstances." We agree up to a point. The legislature and the courts recognize a preference for respecting custody agreements that are in a child's best interests, both because they reflect effective cooperation between the parents and because they likely reduce the need for litigation that consumes judicial resources and is financially and emotionally draining for the parties.[12] But the preference applies only to the extent that the agreements reflect — and continue to reflect — a child's best interests.[13] While courts "*may* engage in a 'less searching' inquiry" when confronted with a custody agreement, the agreement's terms do not control if "the child's best interests justify a deviation."[14]

And when it comes to the best interests of a child in divorce, "[t]rial courts, not parents, are the ultimate decision makers as to custody and are not bound by private agreements."[15] "The court must independently determine what arrangement will best serve the child's interests."[16] Thus, "when a court recognizes or gives attention to an agreement, it does so not because the parties' compact binds the court, but for the light

---

[12]      *Crane v. Crane*, 986 P.2d 881, 888-89 (Alaska 1999).

[13]      *Sherrill v. Sherrill*, 373 P.3d 486, 492 (Alaska 2016).

[14]      *Id.* (emphasis added) (quoting *Crane*, 986 P.2d at 888).

[15]      *McClain v. McClain*, 716 P.2d 381, 385 (Alaska 1986); *see also Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987).

[16]      *McClain*, 716 P.2d at 385.

it sheds on the motives and dispositions of the parties."[17] In this case, therefore, to the extent that the superior court independently evaluated the best interests of the child regardless of the parties' stipulations, it did not err. Amicably-reached custody agreements are to be encouraged, but a court presented with a custody dispute must nonetheless undertake its own full and independent best-interests analysis.

### 1. To modify a custody agreement, the moving party must first show a substantial change in circumstances.

Motions to modify custody are evaluated in two steps: The movant must first show a change in circumstances that would justify a modification, then show that the proposed modification is in the child's best interests.[18] "The required change in circumstances must be significant or substantial, and must be demonstrated relative to the facts and circumstances that existed at the time of the prior custody order that the party seeks to modify."[19] The burden to show the required change is on the moving parent,[20] and "[t]he key inquiry is whether the change is significant enough to warrant the disruption inherent in changing a child's custody schedule or routine."[21] In short, a change is sufficiently substantial for modification purposes only if it "affects the child['s] welfare."[22]

---

[17] *Id*. at 386.

[18] *McLane v. Paul*, 189 P.3d 1039, 1043 (Alaska 2008); *see also* AS 25.20.110(a).

[19] *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000) (citations omitted).

[20] *Chesser-Witmer v. Chesser*, 117 P.3d 711, 717 (Alaska 2005).

[21] *Collier v. Harris*, 261 P.3d 397, 407 (Alaska 2011).

[22] *Rainer v. Poole*, 510 P.3d 476, 481-82 (Alaska 2022). We note here the "well-established rule that an out-of-state move is a substantial change in circumstances as a matter of law," entitling the moving party to a hearing "as a matter of law" on a

**2.    The superior court did not clearly err or abuse its discretion in finding a substantial change in circumstances.**

The 2016 custody agreement requires that "[a]ny attempt by either parent to modify the terms of this agreement with respect to [the child's] scheduled relocation to New Jersey should be rejected absent the existence of circumstances clearly not anticipated by the parties and detrimental to [the child]." J.M. argues that this contractual standard — particularly its use of the phrase "detrimental to [the child]" — is stricter than the legal test, and that the court erred by failing to apply it. She contends that under this test, properly applied, a move to New Jersey would be detrimental only if the child's behavioral issues were such that they could not be satisfactorily addressed there, and she therefore focuses much of her argument on the academic and mental-health resources available in New Jersey.

The court was not obliged to follow the parties' contractual standard if it determined that the child's best interests required something else, as explained above. But in any event, the contractual and legal standards do not appear to be meaningfully different, at least in the context of the findings in this case. A "substantial change"

---

motion to modify custody. *Bagby v. Bagby*, 250 P.3d 1127, 1129-30 (Alaska 2011) (explaining why long-distance separation necessarily affects parents' relative abilities to meet children's needs); *see also Barrett v. Alguire*, 35 P.3d 1, 6 (Alaska 2001); *Acevedo v. Liberty*, 956 P.2d 455, 457 (Alaska 1998). S.C. cited this rule when first moving for modification, though he posited that, because of the parties' agreement that the child would move to New Jersey in 2022, his decision to remain in Alaska instead could be viewed as the decision to move. The parties did not further rely on this rule, however, nor did the court apply it, instead evaluating the evidence of substantial change independent of any presumptions. Because we can affirm the superior court on the basis of the rationale it applied, we do so.

analysis already requires a showing that the change affects the child's welfare;[23] such a change — to the child's detriment — is plainly evident in the superior court's findings.

The court carefully described the parties' different perceptions of the child's mental health and emotional development at the time they entered into the 2016 agreement and how the child's circumstances had changed by the time of trial over five years later. In 2016 the child had some behavioral issues — the severity of which was disputed — but he "had not been formally evaluated or diagnosed with any special needs, and he had not seen any mental health care provider." J.M. testified that the child was then "too young to be diagnosed with ADHD or ODD." It was a year later that the child was first referred to a therapist, when his behavior at preschool worsened.

The court's analysis then "[f]ast forward[ed] to 2021," by which time the child's "situation had significantly changed." The court cited the parenting coordinator's report that the child "suffer[ed] from severe emotional disturbances that he is unable to regulate." The court noted that the child had been "asked to leave" his preschool "and eventually had to be placed in a special program . . . through the school because of his severe behavioral issues."

Properly contrasting the child's circumstances in 2016 with those in 2021, the court concluded that "[i]n every conceivable way, there has been a substantial change in circumstances since the parties' agreement was entered in 2016," and "that change has had a serious and detrimental impact on [the child]." The court's findings are supported by the evidence and not clearly erroneous, and we see no abuse of discretion in its conclusion that the findings demonstrate a "substantial change" that "affects the child's welfare."[24] Even assuming that the court's findings had to instead

---

[23]    *Moore v. McGillis*, 408 P.3d 1196, 1201 (Alaska 2018).

[24]    *Id.*

-11-                                           **7707**

satisfy the parties' contractual test for modification — "circumstances clearly not anticipated by the parties and detrimental to [the child]" — they clearly did. There was conflicting evidence about the child's prospects in 2016, which the court was entitled to weigh in deciding what the contracting parties could have reasonably anticipated,[25] and the court explicitly found that the child's behavioral changes since then "had a serious and detrimental impact on [him]."

### B. The Superior Court Did Not Abuse Its Discretion In Its Best Interests Analysis.

Having found a substantial change in circumstances affecting the child, the court then applied the *Moeller-Prokosch* analysis to determine whether J.M.'s move out of state required a modification of custody.[26] Under the *Moeller-Prokosch* analysis, the court first finds whether a parent's reason for moving out of state is legitimate; if it is, the court then conducts a "symmetric analysis" of the child's best interests.[27] This analytical framework requires the court to consider not only the effect of separating the child from the nonmoving parent but also the "corresponding effect" if the child stays behind while the other parent moves away.[28]

Alaska Statute 25.24.150(c) lists the nine factors courts consider when determining a child's best interests. The court does not need to explicitly discuss each

---

[25]     *See In re Hospitalization of Danielle B.*, 453 P.3d 200, 202-03 (Alaska 2019) ("We grant 'especially great deference' [to the trial court] when the 'findings require weighing the credibility of witnesses and conflicting oral testimony.' " (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011))).

[26]     *See Moeller-Prokosch v. Prokosch* (*Moeller-Prokosch I*), 27 P.3d 314, 316-17 (Alaska 2001).

[27]     *Mengisteab v. Oates*, 425 P.3d 80, 85-86 (Alaska 2018) (explaining two-step approach for determining child's best interests in custody dispute where one parent plans to relocate out of state).

[28]     *Moeller-Prokosch III*, 99 P.3d 531, 535-36 (Alaska 2004).

factor, but "its findings 'must either give us a clear indication of the factors which [it] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[29]

J.M. challenges the superior court's findings on the three factors it found to favor S.C.

### 1.    Capability and desire to meet the child's needs

Alaska Statute 25.24.150(c)(2) requires courts to consider "the capability and desire of each parent" to meet the physical, emotional, mental, religious, and social needs of the child.  Here, the superior court "ha[d] no doubt that both parties have the desire to meet [the child's] needs."  It found that the parties could offer "very similar" support in terms of the necessary programs and services, whether in Anchorage or New Jersey, and that both parents had the financial resources to meet the child's needs.  The court nonetheless found that this factor favored S.C., who the court found "has consistently prioritized [the child's] needs and demonstrated the capability to meet them," as opposed to J.M., who the court found had prioritized her own needs over the child's "when viewing her move to New Jersey."

J.M. faults this conclusion for several reasons.  First, she contends that the court failed to recognize that her ability to meet the child's needs will be much enhanced in New Jersey where she has a larger support system.  But the court did consider this, noting that J.M.'s mother had housing ready for her if she moved and that the child would have greater exposure to J.M.'s side of the family with "aunts, uncles, and cousins nearby."  The court concluded, however, that the problem was not "the lack of resources or services in one geographic location or the other, it is the attitude of the

---

[29]    *Jaymot v. Skillings-Donat*, 216 P.3d 534, 539-40 (Alaska 2009) (quoting *Chesser v. Chesser-Witmer*, 178 P.3d 1154, 1158 (Alaska 2008)).

parents towards those services." The court believed that J.M. was "fixated on her litigation position" rather than the child's best interests, as reflected in her failure to cooperate in an updated psychological evaluation and continued counseling.[30]

J.M. argues that the court's conclusion that she was fixated on litigation overlooks the fact that S.C. "creat[ed] this litigation and this conflict" and that by "working to protect the agreement . . . she is acting in [the child's] best interests." But J.M.'s sincere belief that the parents' original plan is in the child's best interests did not preclude the court from finding otherwise, or from determining that some of her actions were actually contrary to the child's interests. Questions of motivation and intent are especially reliant on witness credibility, which the superior court is in a better position than we are to evaluate.[31] We conclude that the court did not clearly err in its fact-finding or abuse its discretion by deciding that this factor favored S.C.

---

[30] J.M. disputes the court's finding of uncooperativeness, arguing that "[t]he court's findings that Mom stopped taking Son to [counseling] in 2019 [are] not supported by the record." There was conflicting testimony on this point at trial. S.C. asserted that he "consistently brought [the child] to [his counseling] appointments and [J.M.] did not" and that J.M. "wasn't taking [the child] to [his counselor] regularly." J.M. disagreed, claiming that S.C. "brought him [to counseling] maybe a total of four times more than [she] did over four years." The record does show that J.M. did not regularly pay her share of the counselor's fees. The financial records J.M. points to show that she was billed for a number of appointments but do not provide any information about her cooperation in facilitating the appointments themselves. Given the deference due to the trial court's assessment of witness credibility, *Angelica C. v. Jonathan C.*, 519 P.3d 334, 340 (Alaska 2022), we cannot say that the trial court clearly erred by crediting S.C.'s version of events over J.M.'s.

[31] *Kristina B. v. Edward B.*, 329 P.3d 202, 208 (Alaska 2014) (explaining that superior court is "in a better position than we are to weigh the evidence and assess the credibility of witnesses").

## 2.    Stability and continuity

Alaska Statute 25.24.150(c)(5) requires courts to consider "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." We have explained that the stability and continuity factor requires "the superior court to consider 'not only the desirability of maintaining geographical continuity, but also the importance of maximizing relational stability.' This means that '[c]ourts should consider social and emotional factors such as who the primary care-giver was for the child.' "[32] The superior court weighed this factor "strongly" in S.C.'s favor.

The court described in some detail the progression of the child's special needs, medication, therapy, and schooling, concluding that the child at the time of trial had "a stable medical and therapeutic team of support that is either based in Anchorage, or at least on the west coast," as well as teachers "who are familiar with his particular needs, a therapist with whom he is attached . . . , a psychiatrist . . . who seems to have prescribed a good stable mix of medications . . . [, and] a psychologist . . . who has evaluated him twice and could be available to assist again in his treatment." The child was "making progress in school and at home" and "was positive about school and his teacher." And the court attributed these positive developments largely "to the persistent and consistent efforts of his father," S.C., in contrast to J.M., whom the court found to be disorganized and inconsistent in her dealings with the child's treatment providers. Given these factual findings, the court concluded that *not* remaining in Alaska for some additional period of improvement would be detrimental to the child's best interests:

---

[32]    *Saffir v. Wheeler*, 436 P.3d 1009, 1013 (Alaska 2019) (alteration in original) (first quoting *Chesser-Witmer v. Chesser*, 117 P.3d 711, 719 (Alaska 2005); then quoting *Veselsky v. Veselsky*, 113 P.3d 629, 635 (Alaska 2005)).

"He is not at a place where the court believes he can handle the upheaval of a cross-country move, and the change from his established school support and therapeutic team."

The court also made clear that it had considered the 2016 agreement "as it relates to the stability factor because requiring the parties to follow the 2016 agreement is consistent with stability and continuity for [the child]." But the court concluded "there is simply much stronger evidence" that staying in Alaska "outweighs the continuity provided to [the child] by following the parties' pre-set agreement."

J.M. argues that the court erred in finding that she was disorganized, and that it ignored "the fact that she also has ADHD but was successful enough to become a Harvard trained physician." But the court did not minimize J.M.'s accomplishments. Its analysis focused on how J.M.'s disorganization, specifically with regard to making and attending appointments and timely paying professionals, impacted the child's need for stability. The court reasoned that this factor was "especially important" considering the child's special needs, noting the clinical psychologist's "concern[] for the impact that [J.M.'s] disorganization had on [the child]."

J.M. also argues that the child's needs are not so great as to preclude a move. She observes, based on expert testimony and her own experience with the condition, that "[h]aving ADHD does not make a person weak or fragile, it simply requires the person to be more creative in their learning at times." And she asserts that "[b]oth ADHD and ODD are very treatable . . . with appropriate support." But the court did not imply that the child was "weak or fragile" — it found that it was in the child's best interests to remain in Alaska because he had the appropriate support system in place and had made meaningful progress with that support. And the court did not preclude an eventual move, stating that it would expect to see a recommendation from the child's care team and an updated evaluation from treating professionals before

-16-                                                                 7707

deciding that the child was ready to do it.  Again, the court did not clearly err in its relevant factual findings or abuse its discretion by weighing this factor in favor of S.C.

> ### 3. Willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child

Alaska Statute 25.24.150(c)(6) requires courts to consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."  The court faulted both parents for their poor relationship, noting the "complete and utter distrust between the parents" and the poor communication going both ways.  But the court found that "this factor favors Dad" because J.M. "distrusts [S.C.] so mightily [that she] has rarely been willing to promote [the child's] relationship with his Dad."  The court found that J.M. seemed "unable to control her own emotional response to" S.C., "raising parent conflict directly in front of [the child]" and "inappropriately includ[ing] the child in adult conversations."  The court found no similar issues with S.C.

J.M. argues that the court's weighing of the evidence on this factor was inappropriate and failed to seriously consider her side of the story.  She claims that the court "ignores the parties' history — Mom moved back to Alaska after living in New Jersey to participate with Dad in a collaborative law process because she realized the importance of two parents and wanted Son to have Dad in his life."  She lays out the evidence she contends the court should have relied on, showing her own commitment to working cooperatively with S.C., the improvement of her relationship with S.C. and his new wife, and times when S.C. himself was hostile and uncooperative.  She contends that whatever conflict still exists is driven by "[l]itigation, caused by Dad's choices."

Again, however, J.M.'s argument is misplaced given the deference we owe a trial court's fact-finding.  "[I]t is 'the function of the trial court, not this court, to

judge witness credibility and to weigh conflicting evidence.' "[33] We "ordinarily will not overturn a trial court's finding based on conflicting evidence" and "will not reweigh evidence when the record provides clear support for the trial court's ruling."[34] Granted that there is evidence supporting and undercutting *each* parent's willingness and ability to foster a relationship between the child and the other parent, it was up to the superior court, in the first instance, to see how the evidence balanced out. The decision that it favored S.C. has clear support; we cannot say that J.M.'s evidence clearly outweighs it. The superior court did not abuse its discretion by deciding that this factor favored S.C.

### 4. J.M.'s other arguments about the best interests factors

J.M. makes several more cursory arguments challenging the superior court's best interests analysis. First, she argues that the court's final order "contains no discussion of the effects on Son of living in Alaska without Mom" and that this "is not proper application of the symmetrical analysis required by *Saffir* and *Mengisteab*."

In both *Saffir v. Wheeler*[35] and *Mengisteab v. Oates*,[36] we faulted the trial courts for failing to consider the effect on the child of separating from the parent who had been the primary caregiver, an important aspect of the stability and continuity analysis.[37] Here, the superior court's symmetric consideration of this issue is implicit in its extensive discussion contrasting S.C.'s involvement in the child's education and therapy with that of J.M. But the court's explicit focus was on the parties' different

---

[33]    *Pam R. v. State, Dep't of Health & Soc. Servs., Off. Of Child's Servs.*, 185 P.3d 67, 71 (Alaska 2008) (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

[34]    *Id.*

[35]    436 P.3d at 1014.

[36]    425 P.3d 80, 87-89 (Alaska 2018).

[37]    *Saffir*, 436 P.3d at 1014; *Mengisteab*, 425 P.3d at 88-89.

views of what was better for the child: consistency in his therapeutic relationships or a change that would help him build adaptability and resiliency, "because that's the real world."

"A symmetrical analysis does not require detailed parallel findings on every best interests factor."[38] "[I]t is sufficient if the court's findings provide 'a clear indication of the factors [that the court] considered important in exercising its discretion or allows us to glean from the record what considerations were involved.' "[39] In the context of the stability and continuity factor, the parties' disagreement centered on the child's treatment — what it was in Alaska and what it would be in New Jersey. We cannot fault the court for concentrating on that fundamental dispute in its discussion, which makes clear to us what the court "considered important in exercising its discretion."[40]

J.M. also argues that the court erred by relying on outdated evidence in determining that the child would be harmed by a move when "the record shows many interventions and a consensus that Son is doing much better." Addressing the clinical psychologist's initial report, she observes correctly that the clinical psychologist "expressly testified that her May 2018 assessment of Son is too old to be relied on" to show the child's "psychological and emotional state today."

But the fact that the child was doing much better appears to have been undisputed; S.C. himself testified that the child was "thriving." The court made repeated references to the efficacy of the child's current medication regime, his "good

---

[38] *Id.* at 87.

[39] *Id.* (second alteration in original) (quoting *Caroline J. v. Theodore J.*, 354 P.3d 1085, 1092 (Alaska 2015)).

[40] *See id.*

fit" with his therapist, and his "progress in school and at home." It was not because of the child's presently poor emotional state that the court found he should stay where he was, but rather because of this marked improvement — which the court attributed "mostly . . . to the persistent and consistent efforts of his father" and thought it best to continue. We cannot say that the court clearly erred in the way it relied on the history of the child's emotional development since 2016.

In sum, we see no error or abuse of discretion in the superior court's best interests analysis.

### C. Any Error In The Admission Of The Parenting Coordinator Reports Was Harmless.

Finally, J.M. argues that the court erred by admitting the parenting coordinator's reports at trial. Parenting coordinators work with "high conflict parents" to resolve disputes out of court.[41] As described in the order appointing the coordinator in this case, parenting coordinators are required to "keep detailed records of contacts and decisions, and submit a written summary to the court annually." Besides attempting to resolve disputes, parenting coordinators may "make recommendations for modifications of the existing [custody] order."

The order appointing the parenting coordinator in this case states that she "is an officer of the court and enjoys quasi-judicial immunity," that her "file may not be subpoenaed, and [that she] may not be compelled to testify." The order also states that "[c]ommunication with the [parenting coordinator] is *not* confidential or privileged" (emphasis in original), but it further provides that confidential records "will not be disclosed without a court order."

---

[41] *Parenting Coordination*, ALASKA CT. SYS. (last visited May 28, 2024) http://www.courts.alaska.gov/shc/family/parenting-coordination.htm #parent-coord.

The superior court, in allowing the reports' admission, reasoned that given the parenting coordinator's duty to report to the court — with the expectation that the court would actually review those reports — it would be "improper [for the court] to disregard [the reports] when addressing the proposed modification of custody." J.M. disagrees; she contends that "[b]y design, Parenting Coordinators are prevented from being used for or against either party in custody litigation," that their reports are inadmissible hearsay, and that admitting their reports at trial "violates due process." We conclude, however, that regardless of the reports' admissibility, their admission was ultimately harmless.[42]

J.M. contends that "[t]he court's final order relies heavily on the reports," but she describes alleged harm from only one reference, where the court quotes the parenting coordinator's assessment of the child's behavioral issues and predicts dire consequences absent immediate intervention. As relevant here, there are two aspects to the parenting coordinator's comments. First, the court refers to the parenting coordinator's "summary report" of an Individualized Education Program (IEP) meeting she attended along with both parents. While the report does contain the parenting coordinator's own impressions of the meeting and the IEP progress report, the court quoted her impressions to emphasize the deterioration in the child's behavioral issues since 2016. The crucial change, the court said, was the development of "severe emotional disturbances that he is unable to regulate." This conclusion is amply supported not only by the parenting coordinator's report but also by "the current,

---

[42]     Alaska Civil Rule 61 provides that an error in the admission of evidence should not "disturb[] a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

updated IEP document" from which she quotes extensively: that document describes the child's behavioral problems, his inability to self-regulate, and his need for constant attention from educators. The IEP progress report and various other documents describing the child's many behavioral problems at school were among J.M.'s own trial exhibits; their content was available to the court independent of the parenting coordinator's impressions and amply support its conclusions. In short, the excerpts from the parenting coordinator's report that the court quoted in its order were largely cumulative of much other evidence about the child's development and prognosis.

The one aspect of the parenting coordinator's report that does not appear elsewhere in the record is its significant conclusion, quoted by the court, that the parents "have a brief window of time to allow for intervention. Should [the child's] current behavioral issues continue, he will be a likely candidate for inpatient treatment in the near future." S.C. relied on this prediction in his trial testimony, citing it when explaining a disagreement with J.M. over whether the child's condition justified having him attend an extended school year.

While the parenting coordinator's prognosis appears to be the most dire, the court had a great deal of other evidence, as described above, to support its conclusion that the child's behavior had deteriorated significantly since 2016. And its conclusion that a move would be detrimental to the child rested largely on the strength and efficacy of his therapeutic and educational support system, which also has significant support in the evidence. Because we are not convinced that the superior court's decision would have been different had the parenting coordinator's reports not been admitted, we do not need to decide whether there was any error.

V.     CONCLUSION

We AFFIRM the superior court's custody modification order.